**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **CHRISTINA MOJICA BORJAS,**<br><br>Plaintiff,<br><br>v.<br><br>**EL OTRO PUERTO RICO, INC.; and JEROHIM ALONSO MENCHACA ORTIZ,**<br><br>Defendants. | **Civil No.:**<br><br>**RE: SEXUAL HARASSMENT (QUID PRO QUO AND HOSTILE WORK ENVIRONMENT); GENDER DISCRIMINATION; RETALIATION; UNJUST DISMISSAL; WORKPLACE HARASSMENT; DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

**TO THE HONORABLE COURT**:

**COMES NOW,** Plaintiff Christina Mójica Borjas, by and through her undersigned counsel, respectfully brings this action against Defendants El Otro Puerto Rico, Inc. and Jerohim Alonso Menchaca Ortiz, and respectfully **ALLEGES, SOLICITS and PRAYS**:

**I.      JURISDICTION AND VENUE**

1.      This Honorable Court has subject matter jurisdiction over this action pursuant to **28 U.S.C. § 1332** (diversity of citizenship). There is complete diversity of citizenship between all parties, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests and costs.

2.      Plaintiff Christina Mójica Borjas is a citizen of the State of Florida, domiciled at 3301 32nd Ave S, Apt. 224, St. Petersburg, Pinellas County, Florida 33712. Plaintiff's Florida domicile is established by an exceptionally robust evidentiary record, including: (a) active residential utility service (Duke Energy Florida) in Plaintiff's name at the above address since March 2025; (b) a residential lease agreement for Apartment No. 224, 3301 32nd Ave South, St. Petersburg, Florida, effective July 28, 2025, through July 27, 2026, at a monthly rent of $1,850.00; (c) a Florida Identification Card (No. M639-427-85-700-0) issued by the Florida Highway Safety and Motor Vehicles on March 27, 2026; (d) Voter registration in Pinellas County, Florida, Registration No. 134328284, effective March 27, 2026; (e) a Florida Driver License (Class E) issued by FLHSMV on April 14, 2026; and (f) a Declaration of Domicile executed on April 16,

1

2026, pursuant to Fla. Stat. § 222.17, notarized by Florida Notary Public Natalia Arcila (Commission No. HH 281813), and recorded as Inst. No. 2026103909, Official Records Book 23528, Page 613-613, Pinellas County Clerk of Court, reflecting Plaintiff's permanent change of domicile from 596 Avenida Hostos, San Juan, Puerto Rico to St. Petersburg, Florida.

3.      Defendant El Otro Puerto Rico, Inc. ("EOPR") is a nonprofit corporation organized and existing under the laws of the Commonwealth of Puerto Rico, with its principal place of business at Urb. Santa Rita, Jorge Romany Street, San Juan, Puerto Rico 00926. For purposes of 28 U.S.C. § 1332(c)(1), EOPR is a citizen of Puerto Rico.

4.      Defendant Jerohim Alonso Menchaca Ortiz ("Alonso") is an individual domiciled, upon information and belief, in Puerto Rico. At all times relevant to this Complaint, he served as Executive Director of EOPR and as Plaintiff's immediate supervisor.

5.      Venue is proper in the District of Puerto Rico pursuant to **28 U.S.C. § 1391(b)(2)** because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in San Juan, Puerto Rico, and all Defendants reside and/or operate within this district.

## II.      THE PARTIES

### A. Plaintiff

6.      Christina Mójica Borjas is a public policy professional with exceptional academic credentials and professional experience: she holds a Bachelor's degree in English Literature and is currently completing a Master's degree in Diplomacy and International Relations, with a specialization in Foreign Policy Analysis and International Law, with one course remaining to fulfill the degree requirements. She served as President of her graduate class for two consecutive years and as Executive Director of the *Journal of Diplomacy and International Relations*. Prior to her employment with EOPR, Plaintiff completed a fellowship at the Permanent Mission of Costa Rica to the United Nations, where she drafted speeches, policy memoranda, and briefings on international law and women's security issues for the Ambassador. She further accumulated more than five years of public policy and advocacy experience in Puerto Rico, working with Boricuas Unidos en la Diáspora, Mi Patria, the Puerto Rico Alliance, the Center for Popular Democracy, and Power4PuertoRico, and served as national spokesperson and congressional lobbyist in the #NotYourTaxHaven campaign.

7.      At the time of her interview with EOPR in February 2024, Plaintiff was facing serious financial difficulties — her part-time teaching income was insufficient to cover her living

2

expenses and she was seriously considering relocating to the United States mainland. Defendant Alonso was fully aware of Plaintiff's precarious financial situation and economic vulnerability from the outset of their contact, as Plaintiff disclosed these circumstances during her employment interview. This knowledge placed Alonso in a position of deliberate power over Plaintiff from their very first encounter.

8.      Plaintiff was employed by EOPR as a Public Policy Analyst from on or about February 26, 2024, through July 25, 2024, when Defendant Alonso unlawfully terminated her employment.

**B.      Defendant El Otro Puerto Rico, Inc.**

9.      EOPR is a nonprofit public policy organization based in San Juan, Puerto Rico. At all times relevant to this Complaint, EOPR employed Defendant Alonso as its Executive Director and as Plaintiff's direct and only supervisor. EOPR knew or should have known of Alonso's systematic pattern of discriminatory and harassing conduct toward female employees and, notwithstanding such knowledge, failed to take any corrective action whatsoever. By virtue of its deliberate inaction, EOPR bears direct and vicarious liability for all unlawful conduct described herein.

**C.   Defendant Jerohim Alonso Menchaca Ortiz**

10.      Defendant Alonso served as Executive Director of EOPR and as Plaintiff's immediate supervisor throughout the entirety of her employment. Alonso is sued in his individual capacity and as agent and representative of EOPR. At all relevant times, he was the sole decision-maker with authority over Plaintiff's hiring, compensation, working conditions, and termination.

11.      Throughout Plaintiff's employment, Alonso maintained a romantic and cohabitating relationship with Jomayra, a colleague and subordinate at EOPR. This relationship created pervasive conflicts of interest, generated a toxic interpersonal dynamic within the workplace, and contributed directly to the hostile and dysfunctional environment that Plaintiff was forced to endure.

12.      Compounding his pattern of misconduct, Alonso preemptively sought to deflect accountability for his conduct from the outset of his interactions with Plaintiff and other team members by invoking his ADHD diagnosis, stating that any behavior perceived as rude, disruptive, or inappropriate should be attributed to his condition rather than to any intentional misconduct. This calculated strategy of weaponizing a medical diagnosis as a shield against professional

3

accountability was systematic, deliberate, and served to perpetuate a climate in which Alonso faced no consequences for his discriminatory and abusive conduct.

### III.    FACTUAL ALLEGATIONS

### A.  Pre-Employment Sexual Harassment — Quid Pro Quo (February 6–26, 2024)

13.    On or about February 6, 2024, Plaintiff interviewed with Defendant Alonso for the position of Public Policy Analyst at EOPR. During the interview, Alonso diverted the conversation from professional topics to personal matters, expressing curiosity about Plaintiff's personal life and social connections rather than focusing on her qualifications and professional experience. Critically, Plaintiff disclosed during this interview that she was facing serious financial difficulties — her part-time teaching income was no longer sufficient to cover her expenses — and that she was seriously considering relocating to the United States mainland. Alonso thus acquired, from the very first meeting, full knowledge that Plaintiff was in a position of acute economic vulnerability and urgency with respect to the pending hiring decision.

14.    Armed with this knowledge, and while Plaintiff awaited EOPR's hiring decision — rendering her economically dependent upon his determination — Alonso contacted Plaintiff via Instagram on or about February 12, 2024, initiating a series of personal and romantic communications entirely unrelated to any professional purpose. Alonso initiated contact by responding to an Instagram story Plaintiff had posted about attending a Carnaval in Ponce. Plaintiff found it odd and deeply uncomfortable that her potential supervisor was contacting her through social media while she awaited a critical employment decision, particularly given his full awareness of her financial precarity.

15.    Between February 12 and 20, 2024, Alonso's Instagram communications escalated significantly in their personal and romantic nature. He inquired whether Plaintiff was married or in a relationship ("nada de eso"), voluntarily disclosed that he was single despite Plaintiff never asking about his personal life, inquired about Plaintiff's sexual orientation — specifically asking whether she was interested in men or women, and volunteering that he preferred women and that many women had stopped speaking to him after he disclosed this — and proposed spending personal time together, including cooking at Plaintiff's apartment, watching movies together, and social outings involving alcohol and wine. These advances were unwelcome, unsolicited, and entirely inappropriate given the supervisory relationship.

4

16.    On or about February 17, 2024, Alonso escalated further by suggesting that he and Plaintiff watch a horror film together. Plaintiff deflected the invitation by claiming she had visitors from the mainland and was occupied hosting them, thereby avoiding a direct confrontation while awaiting the employment decision on which her financial stability depended.

17.    Throughout this period, Plaintiff felt compelled to continue the communications out of politeness and economic necessity, as she was entirely dependent on Alonso's hiring decision and unsure of the consequences of rebuffing him directly. Notwithstanding her discomfort, Plaintiff repeatedly redirected the conversation toward the pending hiring decision and her financial urgency. Alonso consistently ignored these signals and steered the exchange back toward personal and romantic topics.

18.    On or about February 21, 2024, Alonso called Plaintiff to inform her that she had been selected for the position of Public Policy Analyst at EOPR. The employment offer was thus extended following weeks of romantic and personal communications initiated and escalated by Alonso while Plaintiff was a candidate under his exclusive evaluation and economic control.

19.    On or about February 26, 2024, Plaintiff signed her employment contract with EOPR. During this meeting, Alonso emphasized EOPR's organizational policy prohibiting romantic relationships in the workplace and specifically instructed Plaintiff that she was required to notify him personally if she became romantically involved with any fellow employee. This instruction — delivered by the very supervisor who had spent the prior two weeks pursuing a romantic relationship with Plaintiff — was not a neutral policy reminder. It was a deliberate mechanism to establish, from the outset of the employment relationship, a regime of surveillance, monitoring, and control over Plaintiff's personal and romantic life.

20.    Consistent with this pattern, on or about February 27, 2024, during a work-related discussion of an upcoming trip to Washington, D.C. in connection with lobbying efforts against Act 22, Alonso suggested that he and Plaintiff travel together from Puerto Rico to Washington and appended a blushing emoji to his message. Plaintiff deliberately deflected his invitation by mentioning that she needed to confirm dates with the event organizer and had friends from graduate school in Washington she intended to visit, thus avoiding a direct rejection while preserving the professional relationship.

21.    The totality of the romantic and sexual conduct described in paragraphs 13 through 20 was initiated by Alonso *before* he extended the employment offer to Plaintiff, at a time when

Plaintiff was economically vulnerable and entirely dependent upon his hiring decision. The employment offer, extended following weeks of personal and romantic pursuit, is reasonably understood as having been implicitly conditioned upon Plaintiff's receptivity to Alonso's advances. This course of conduct constitutes classic and egregious quid pro quo sexual harassment.

**B.    Hostile Work Environment During Employment (March–June 2024)**

22.    On or about March 2, 2024, even before Plaintiff's first official team meeting, she witnessed Alonso humiliate a female colleague, Karla, in Plaintiff's presence. The only individuals present were Alonso, Karla, and Plaintiff. When Karla enthusiastically shared ideas for the organization, Alonso dismissed her outright, stating: "I've been doing this for 14 years, and you just got here. You should focus on just doing your job right now." Plaintiff observed the blood drain from Karla's face. Alonso never apologized. This incident established for Plaintiff, from her very first days at EOPR, the hostile and demeaning environment that Alonso had created for female employees.

23.    On or about March 4, 2024, Plaintiff attended her first official team meeting at EOPR. Consistent with the tension she had already witnessed, Alonso appeared visibly nervous and uncomfortable, and there was palpable friction between him and his romantic partner Jomayra, who was also present as a colleague. This interpersonal dynamic — the result of Alonso's blurred professional and personal boundaries — was immediately apparent to Plaintiff and confirmed her concerns about the workplace environment. Throughout Plaintiff's employment, Jomayra was repeatedly rude and hostile toward Plaintiff: during team meetings, Jomayra aggressively dismissed and openly mocked Plaintiff's ideas and contributions. Plaintiff raised these concerns with Alonso on multiple occasions, but Alonso consistently feigned incomprehension and took no action. Following the conclusion of Plaintiff's employment at EOPR, Jomayra immediately unfollowed Plaintiff on social media — conduct that, in context, corroborated Plaintiff's longstanding impression that Jomayra had harbored personal hostility toward her from the outset of her employment.

24.    At a subsequent team meeting on or about April 8, 2024, Alonso addressed the team about the Karla incident but, rather than accepting responsibility, framed his conduct as a product of his ADHD diagnosis. He stated that if he ever seemed rude or interruptive, it was not because he was being "toxic or anything" but because of his condition. This response was not a genuine acknowledgment of wrongdoing — it was a calculated deflection that weaponized a medical

6

condition to immunize himself from accountability for discriminatory and abusive conduct directed at female employees.

26. On or about March 17, 2024, Plaintiff encountered Alonso and Jomayra at a local grocery store (Supermax). Alonso appeared visibly uncomfortable and nervous upon seeing Plaintiff in a social context, further evidencing the inappropriate personal dynamic he had created.

26. The following day, on or about March 18, 2024, during a work meeting in which Alonso and Plaintiff remained behind to discuss a policy proposal, Alonso made unsolicited and derogatory comments about the man Plaintiff had been with at the grocery store — her former boyfriend, with whom she remained friends — referencing his physical appearance and declaring that he thought Plaintiff could "do much better." Alonso then disclosed that Jomayra was his romantic partner and that they lived together, while simultaneously continuing to exhibit romantic interest toward Plaintiff. This conduct demonstrated Alonso's belief that he had a claim over Plaintiff's personal life and romantic choices.

27. In or about April 2024, while at the EOPR office, Alonso overheard Plaintiff discussing with Karla a person she had recently gone on a date with. After Karla left the room, Alonso asked Plaintiff to show him a photograph of this person. Upon seeing the photograph, Alonso's first comment was that the man was also bald, like himself. He then asked about the man's profession, and when Plaintiff mentioned he had been a professional basketball player, Alonso immediately stated that he would "definitely" cheat on her and that she should be careful — adding, unprompted, that Plaintiff should "watch out for STDs." When Plaintiff responded that she was practicing celibacy, Alonso corrected her and stated that the correct term was "abstinence." These intrusive, controlling, and sexually charged comments made Plaintiff increasingly uncomfortable, as it became unmistakably apparent that Alonso resented the idea of Plaintiff dating anyone else.

28. On or about April 15, 2024, at the regular Monday team meeting, Alonso rearranged the seating to position himself next to Plaintiff. Throughout the meeting — during which Karla was presenting the employee handbook she had developed — Alonso continuously fixed his gaze on Plaintiff rather than attending to the presentation. When the meeting concluded, Alonso used a comment about Plaintiff's flower hair clip as a pretext to initiate personal conversation, despite the fact that his partner Jomayra was seated immediately next to him.

7

Plaintiff found this behavior deeply uncomfortable, as it was evident that Alonso was deliberately using her to provoke jealousy in Jomayra.

29. After the April 15 meeting, Jomayra asked the women of the team to pose for a group photograph for International Day for the Elimination of Violence Against Women. While the photograph was being taken, Plaintiff asked Jomayra — in front of the entire group — if Jomayra could tag her in the photo so her "crush" could see it. Jomayra burst out laughing — a reaction that confirmed to Plaintiff that Jomayra was fully aware of Alonso's conduct and found the situation amusing. Plaintiff made this comment deliberately and strategically to signal, before witnesses, that she had no romantic interest in Alonso.

30. Shortly thereafter, in or about April 2024, Plaintiff disclosed Alonso's pattern of behavior to colleague Karla. Karla confirmed that she was already familiar with Alonso's conduct and his systematic disregard for female employees' professional contributions and personal boundaries, and advised Plaintiff to establish firm professional limits with him. Karla's familiarity with Alonso's conduct further confirmed its pervasive and systemic nature.

31. On or about June 5, 2024, Alonso relocated a scheduled work meeting from the EOPR office to Panismo, a local café. He arrived late. When he found that Plaintiff had already ordered coffee and a breakfast platter, he expressed disappointment, stating that he had planned to treat her to breakfast. Plaintiff declined. The meeting lasted over two hours, during which Alonso spoke exclusively about his personal life, asked Plaintiff about the man she had been dating, questioned why she did not date people outside her professional and political circles, and — when Plaintiff declined to engage with his framing — made a condescending comment suggesting that people outside those circles were inherently less intelligent. Plaintiff pushed back firmly. Work was never discussed at any point during the meeting.

C. **Plaintiff's Rejection of Advances and Defendants' Retaliatory Response (May–July 2024)**

32. Beginning in May 2024, Plaintiff took deliberate and measured steps to establish professional boundaries with Alonso and to signal her lack of romantic interest: she ceased responding to non-work-related messages and memes he sent on social media, began delaying responses to his non-work communications by several days, and blocked Alonso from viewing her Instagram Stories. Alonso's response to this boundary-setting was immediate, severe, and sustained — marking the beginning of a calculated campaign of retaliation.

33.    On or about May 9, 2024, Plaintiff met with Alonso at the EOPR office to present the housing policy proposal she had been developing. The meeting was positive: Alonso provided favorable feedback, indicated he could help with the missing sections the following week, and invited Plaintiff to lunch. They worked together for several additional hours that afternoon. Before Plaintiff left, Alonso told her the proposal looked good and just needed some refinements.

34.    Just two days later, on Saturday, May 11, 2024, at approximately 10:02 p.m., Alonso called Plaintiff in an aggressive and hostile tone. He subjected the same housing proposal he had praised on May 9 to severe and unfounded criticism, declaring it was "nowhere near done" and berating Plaintiff for not including enough data in the "problems" section — despite the fact that Alonso himself had previously agreed with this exact approach. Plaintiff attempted to remind him that he had reviewed and approved the proposal at every stage, but Alonso repeatedly ignored her and grew angrier. Moreover, based on audio delays in the call, Plaintiff noticed that Alonso appeared to have her on speakerphone, suggesting that a third party was present and listening. This abrupt reversal — occurring immediately after Plaintiff's boundary-setting — was the first overt act of retaliation.

35.    The following day, Plaintiff's personal computer crashed while she was working on the proposal. She called Alonso, who told her not to worry and instructed her to come to the office on Monday, May 13, assuring her that they would resolve the issue together. No specific instructions were provided.

36.    On May 13, 2024, Plaintiff arrived at the EOPR office and waited outside for over one hour for Alonso to appear. When he finally arrived, he provided a new laptop for Plaintiff to use. Plaintiff mentioned that she had a previously scheduled appointment at the Mac repair center later that day to fix her personal laptop — which she relied upon for her part-time online teaching position. This information visibly upset Alonso, who questioned repeatedly why she could not simply use the work laptop or his personal laptop instead. Plaintiff explained that she could not depend on a work device for her other employment, as she would lose access to it if her contract ended, and that she had never been told she was required to remain in the office full-time. Plaintiff returned to the office at 2:50 p.m. as promised. Alonso, however, did not arrive until 3:40 p.m., explaining that he had been eating.

37.    Compounding this abuse, that same evening — May 13, 2024 — after Plaintiff had gone home to care for her pets, Alonso demanded that they meet on a Zoom video call to review

9

the proposal. The Zoom call began at 9:00 p.m. and did not conclude until 10:00 p.m. Furthermore, Alonso expected Plaintiff to return to the office the following morning at 8:00 a.m., despite the fact that her employment contract did not require full-time in-office presence and that Plaintiff relied on public transportation in an area of Río Piedras she considered unsafe after dark — a concern she had communicated to Alonso directly, as the EOPR office faced a homeless encampment where Plaintiff had personally witnessed frequent altercations involving knives. This pattern of after-hours demands and unreasonable scheduling was not accidental — it was a deliberate tactic to undermine Plaintiff's ability to perform her work and to manufacture grounds for criticism.

38.    During the confrontation at the office on May 13, 2024, Alonso launched into a tirade against Plaintiff, accusing her of irresponsibility and of not taking her work seriously — despite her having arrived within her agreed working hours. He then referenced a photograph Plaintiff had posted on her personal social media account showing her at lunch with a friend, characterized it as a "date," and accused her of slacking off. He further criticized her Washington, D.C. advocacy trip — which he himself had previously approved — stating she should never have gone if her work was not finished. When Plaintiff defended herself and reminded him that he had approved the trip and reviewed the proposal at every stage, Alonso responded with contempt: "I interviewed more qualified candidates, but I gave you a chance." Fearing for her job, Plaintiff apologized in order to de-escalate the situation.

39.    Between May 16 and 17, 2024, Alonso disappeared entirely from the office. His partner Jomayra had traveled to Mexico for work, and Alonso did not appear at all on Thursday or Friday, despite having previously assured Plaintiff he would be present throughout the week to assist with the proposal. As a direct consequence of his absence, Plaintiff worked well over forty (40) hours that week, although she was compensated for only twenty (20) hours. Plaintiff kept Alonso informed by text message of her arrivals and departures from the office throughout this period. Alonso was thus fully aware of the additional uncompensated hours Plaintiff was working on his behalf.

40.    On or about May 21, 2024, Plaintiff arrived at the EOPR office for a one-on-one meeting with Alonso that had been scheduled just the previous day. She waited outside the office for nearly thirty (30) minutes before Alonso called her from Dorado to inform her that he had

completely forgotten about the meeting. This pattern of deliberate disregard for Plaintiff's time and professional commitments was consistent with Alonso's broader strategy of destabilization.

41.   Throughout Plaintiff's employment, Alonso's management of payroll was consistently unreliable and disrespectful toward the entire team. Plaintiff and her colleagues were regularly required to pursue Alonso multiple times each month simply to receive their paychecks. Alonso would frequently ignore messages, mark them as "read" without responding, arrive at the office late, or claim to have forgotten to bring the checks. At the team's three-month review, when colleague Karla politely raised the issue of timely paycheck distribution, Alonso deflected by claiming it was the employees' responsibility to submit invoices on time. Consistent with this pattern, after Plaintiff's termination, she was required to follow up with Alonso multiple times to receive her final paycheck, as he systematically ignored her emails.

42.   Between July 3 and July 9, 2024, Alonso repeatedly promised to send Plaintiff the access link to the Canva platform she needed to edit the presentation slides for the upcoming press conference. He never sent the link. He ignored Plaintiff's calls and text messages. He canceled the Monday team meeting via group chat without addressing the outstanding access issue. On or about July 9, 2024, Alonso called Plaintiff and demanded the slides be completed within two days — despite having deliberately withheld the platform access required to complete them. When Plaintiff asked him where the link was, Alonso exploded in a patronizing tone. Plaintiff firmly told him not to speak to her in that manner, noting that he did not address other team members with such disrespect. Alonso's response was dismissive and contemptuous: "Christina, bájale dos." Approximately twenty minutes after the call ended, Alonso finally sent the Canva link via email — thereby confirming that he had possessed the link throughout the entire period during which he was demanding that Plaintiff complete work he had made impossible. Alonso never apologized.

43.   On or about July 16, 2024, EOPR held a press conference at which Plaintiff's housing policy proposal — which she had independently researched, drafted, and developed over the course of months — was publicly presented and generated significant media coverage. Prior to the press conference, Alonso provided Plaintiff with a press release containing a quote attributed to her stating that the proposal had been developed in collaboration with the community. This statement was false: Plaintiff had not met with any community members during the drafting process. When Plaintiff objected and told Alonso she was uncomfortable attributing to herself a statement she knew to be inaccurate, the quote was only slightly revised but continued to imply

community collaboration that had not occurred. Alonso thus attempted to require Plaintiff to publicly endorse a false statement — an act that compounded the hostile and manipulative environment he had created.

44.    At the press conference itself, Alonso appropriated credit for Plaintiff's work product and appeared visibly displeased when a reporter from *El Diario* expressed interest in interviewing Plaintiff directly about the proposal. Alonso subsequently prevented Plaintiff from establishing contacts with candidates and elected officials regarding the proposal, thereby deliberately blocking the professional opportunities that her work had generated and ensuring that all credit and recognition accrued exclusively to him.

45.    On the morning of the July 16 press conference, Alonso shared with Plaintiff a personal story about having been locked out of his apartment the night before — recounting how Jomayra had a spare key to his apartment unit but not to the building's front door, requiring him to wait until 5:00 a.m. for another tenant to open the building. In the context of the relationship between the parties and the existing pattern of conduct, Plaintiff reasonably understood this unsolicited personal disclosure as Alonso's deliberate attempt to signal that his relationship with Jomayra was deteriorating and that he was again available romantically. Plaintiff found this intrusion deeply uncomfortable.

46.    On or about July 25, 2024 — one week after the press conference at which Plaintiff's work generated EOPR's most significant recent public attention — Defendant Alonso summoned Plaintiff to a one-on-one meeting and informed her that her employment contract would not be renewed due to "budget cuts" and "lack of professional fit." He provided no further details, no documentation, no prior warnings, no performance evaluations, and no opportunity for Plaintiff to respond or address any purported deficiencies. The termination was abrupt, arbitrary, and occurred immediately after Plaintiff's most consequential professional contribution to the organization.

47.    It bears noting that July 25, 2024 was also the day on which Plaintiff received a job offer from another employer — one that carried a significantly higher salary, better benefits, and an environment of genuine professional respect. Nonetheless, Plaintiff's unlawful termination by EOPR caused her immediate and substantial economic harm, in addition to the profound professional and emotional damage she sustained throughout her employment.

12

**48.**    Approximately two weeks after the termination, Alonso made public comments — in the context of discussing future hiring at EOPR — stating that he no longer wished to hire "inexperienced" people. Given that Plaintiff was the only person whose contract had been terminated, this comment was a transparent and contemptuous reference to her, and constitutes further evidence of the retaliatory and discriminatory animus that motivated her dismissal — particularly in light of Plaintiff's advanced graduate degree, five years of professional experience, and the quality of the policy work she had produced for the organization.

**49.**    The proffered reasons for Plaintiff's termination are entirely pretextual. No evidence of any actual budget reduction at EOPR exists; Plaintiff was the only employee terminated. She had received no negative performance evaluations, no written warnings, and had not been placed on any performance improvement plan at any point during her employment. The "professional fit" rationale is wholly unsupported by any documentation and was communicated without prior process or warning of any kind. The termination occurred one week after Plaintiff's most valuable professional contribution to EOPR and in direct temporal proximity to her most assertive rejection of Alonso's abusive conduct on July 9, 2024.

**50.**    The causal chain between Plaintiff's rejection of Alonso's advances and her termination is direct, documented, and unmistakable. The systematic deterioration of Alonso's professional conduct toward Plaintiff began immediately upon her boundary-setting in May 2024 — the late-night Saturday call, the manufactured criticisms, the sabotage of work deliverables, the withheld platform access, the public humiliation, the unpaid overtime — and culminated in her termination one week after the press conference and days after her most direct and forceful rejection of his abusive conduct. The temporal proximity, the absence of any legitimate basis, and Alonso's post-termination statements collectively establish retaliatory and discriminatory intent beyond any reasonable dispute.

**D.    Pattern of Discriminatory and Retaliatory Conduct Against Female Employees**

**51.**    Alonso's discriminatory and retaliatory conduct was not limited to Plaintiff. Throughout her employment, Plaintiff observed and documented a systemic pattern of targeted mistreatment of female employees by Alonso, which further establishes the discriminatory and gender-based nature of his conduct:

(a) Karla: A female colleague who was humiliated by Alonso in Plaintiff's presence on March 2, 2024, who confirmed to Plaintiff that she was familiar with Alonso's pattern of

dismissing female employees' professional contributions and personal boundaries, and who ultimately resigned from EOPR approximately one month after Plaintiff's termination;

(b) Alexandra: A female colleague in the economic development area who resigned from EOPR in March 2025 under circumstances consistent with Alonso's documented pattern of targeting and driving out female employees; and

(c) Linda: A female colleague who had been attending law school and who progressively ceased attending work meetings and became entirely unreachable, without any formal acknowledgment or exit process from EOPR, leading the team to assume she had quit.

52. The pervasive discomfort that Alonso's conduct generated among the team was further evidenced by a telling incident: Alonso invited the entire team to a dinner "on him" to celebrate Linda's law school graduation and Karla's completion of her master's degree — and not a single team member replied in the group chat or attended. This collective silence spoke volumes about the environment Alonso had created and the degree to which every member of the team sought to limit their exposure to him outside of mandatory professional obligations.

53. Plaintiff filed charges of discrimination with the Puerto Rico Department of Labor and Human Resources (DTRH) / Unidad Antidiscrimen (UADAU), bearing case numbers UADAU 25-134A and 16H-2025-00227. On December 8, 2025, the DTRH issued a right-to-sue letter authorizing Plaintiff to pursue her claims before this Court and closing the administrative proceeding. All administrative prerequisites to suit have been fully satisfied.

## IV.    CAUSES OF ACTION

### COUNT I — SEXUAL HARASSMENT: QUID PRO QUO
*(Against All Defendants — P.R. Law No. 17 of April 22, 1988, 29 L.P.R.A. §§ 155a–155e)*

54. Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

55. Plaintiff is a member of a protected class by virtue of her sex and gender (female).

56. Defendant Alonso subjected Plaintiff to unwelcome sexual and romantic advances commencing before the employment offer was extended, including: repeated personal and romantic communications via Instagram initiated while Plaintiff was a candidate under his exclusive evaluation; intrusive inquiries into her sexual orientation, marital status, and romantic life; repeated proposals for personal social outings; and continued romantic overtures throughout her employment. This conduct was unwelcome, unsolicited, and directed at Plaintiff because of her sex.

14

57. The sexual and romantic conduct of Alonso was directly and inextricably linked to a term and condition of Plaintiff's employment. The advances commenced while Plaintiff was an applicant in a position of acute economic vulnerability and urgency, fully dependent upon Alonso's hiring decision. The employment offer, extended following weeks of romantic and personal pursuit, is reasonably understood as having been implicitly conditioned upon Plaintiff's receptivity to Alonso's advances. Accordingly, the employment benefit Plaintiff received was tainted from its inception by unlawful sexual coercion.

58. When Plaintiff rejected Alonso's advances and established professional boundaries, she was subjected immediately to a sustained, escalating, and multi-faceted campaign of adverse employment actions, culminating in the unlawful termination of her employment on July 25, 2024.

59. As the employer, EOPR is vicariously liable for the quid pro quo sexual harassment perpetrated by Alonso, its Executive Director and Plaintiff's sole supervisor, who exercised exclusive and unilateral authority over all terms and conditions of Plaintiff's employment.

60. As a direct and proximate result of this quid pro quo sexual harassment, Plaintiff has suffered and continues to suffer severe emotional distress, economic harm, damage to her professional reputation, and loss of employment and career opportunities. Plaintiff is therefore entitled to compensatory damages, punitive damages, attorney's fees, and costs.

**COUNT II — SEXUAL HARASSMENT: HOSTILE WORK ENVIRONMENT**
*(Against All Defendants — P.R. Law No. 17 of April 22, 1988, 29 L.P.R.A. §§ 155a–155e)*

61. Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

62. The conduct described herein — including but not limited to Alonso's sustained romantic and sexual communications before and during employment; his deliberate and repeated personal intrusions into Plaintiff's romantic life; his surveillance of her social media activity; his possessive and controlling behavior, including referencing her personal social media posts as evidence of professional misconduct; his deliberate rearrangement of seating to remain physically proximate to Plaintiff during team meetings; his use of Plaintiff to provoke jealousy in his partner; his disclosure of personal relationship information designed to signal romantic availability; and the pervasive, unrelenting atmosphere of sexual and romantic pressure — was severe and pervasive, entirely unwelcome, and directed at Plaintiff because of her sex.

63. This conduct unreasonably interfered with Plaintiff's work performance and created an intimidating, hostile, and offensive working environment that materially and adversely

affected the terms and conditions of her employment. Plaintiff was forced to navigate this environment while simultaneously trying to perform her professional duties at the highest level.

64. EOPR knew or should have known of the hostile work environment created by its Executive Director and utterly failed to take any prompt or effective remedial action. Because Alonso occupied the highest position of authority at EOPR and served as Plaintiff's sole supervisor, his conduct is directly attributable to EOPR as a matter of law, and EOPR cannot avail itself of any affirmative defense.

65. As a direct and proximate result of the hostile work environment, Plaintiff suffered severe emotional distress, loss of workplace security, significant economic harm, and reputational damage. Plaintiff is therefore entitled to compensatory and punitive damages.

### COUNT III — GENDER DISCRIMINATION
*(P.R. Law No. 100 of June 30, 1959, 29 L.P.R.A. §§ 146–151)*

66. Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

67. Plaintiff was subjected to adverse, differential, and discriminatory treatment in the terms, conditions, and privileges of her employment based on her sex and gender, including: unwanted sexual and romantic advances; surveillance and monitoring of her personal relationships; deliberate sabotage of her work assignments; systematic withholding of resources necessary to complete assigned deliverables; public humiliation and demeaning comments about her qualifications; appropriation of her work product; exclusion from professional recognition; and ultimate termination of her employment.

68. Moreover, the discriminatory treatment of Plaintiff was not an isolated incident but part of a documented and systematic pattern of gender-based targeting by Alonso that affected multiple female employees at EOPR, including Karla (humiliated in Plaintiff's presence and forced to resign), Alexandra (resigned March 2025), and Linda (abandoned the organization under unexplained circumstances). This pattern conclusively establishes that Alonso's conduct was not incidental but intentional and gender-based.

69. Under Law 100, a presumption of discriminatory intent arises from the disparate and adverse treatment demonstrated herein, and the burden shifts to Defendants to establish just cause for every adverse employment action taken against Plaintiff. Defendants cannot satisfy this burden.

70. As a direct and proximate result of this gender discrimination, Plaintiff has suffered significant economic losses, severe emotional distress, reputational harm, and loss of professional

16

opportunities. Plaintiff is therefore entitled to double indemnification pursuant to Law 100, in addition to all other available remedies.

## COUNT IV — RETALIATION
*(P.R. Law No. 115 of December 20, 1991, 29 L.P.R.A. §§ 194–194b)*

71.    Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

72.    Throughout her employment, Plaintiff engaged in statutorily protected activity by: rejecting Defendant Alonso's unwelcome sexual and romantic advances; establishing professional boundaries, including delaying responses to non-work communications and blocking Alonso from viewing her Instagram Stories; verbally confronting Alonso regarding his abusive, patronizing, and unprofessional conduct on or about July 9, 2024; and refusing to publicly endorse a false statement in the press release associated with the July 16, 2024 press conference.

73.    In direct temporal and causal response to Plaintiff's protected activity, Defendants subjected her to an escalating series of materially adverse employment actions, including: (a) the abrupt and hostile reversal of prior approval for her policy work on May 11, 2024; (b) manufactured criticism, public humiliation, and demeaning comments about her professional qualifications; (c) the deliberate withholding of platform access — the Canva link — necessary to complete an assigned deliverable; (d) demands for after-hours work, including a 9:00–10:00 p.m. Zoom meeting on a weeknight; (e) requiring unpaid overtime of over forty (40) hours in a single week; (f) systematic cancellation of scheduled meetings and deliberate unresponsiveness; (g) appropriation of Plaintiff's work product and exclusion from professional recognition; and (h) the termination of Plaintiff's employment on July 25, 2024.

74.    The causal nexus between Plaintiff's protected activity and the foregoing adverse employment actions is established conclusively by: (1) the immediate and dramatic deterioration of Alonso's professional conduct beginning precisely when Plaintiff began setting boundaries in May 2024; (2) the termination occurring one week after the most successful public event of Plaintiff's tenure and days after her most direct verbal rejection of Alonso's abusive conduct; (3) Alonso's post-termination public comment about not wanting to hire "inexperienced" people — a transparent reference to Plaintiff — confirming his personal animus; and (4) the complete absence of any legitimate, documented, or non-pretextual basis for the termination.

75.    As a direct and proximate result of Defendants' retaliation, Plaintiff is entilted to front pay and lost wages compensation covering the full economic harm resulting from her unlawful termination, including the loss of salary, benefits, and professional opportunities from

17

the date of termination through the date of judgment, double indemnification, compensatory damages, attorney's fees, and costs, as provided under Law 115.

## COUNT V — UNJUST DISMISSAL

*Against Defendant El Otro Puerto Rico, Inc. — P.R. Law No. 80 of May 30, 1976, 29 L.P.R.A. §§ 185a–185l*

76.     Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

77.     Plaintiff was employed by EOPR pursuant to a valid employment contract from February 26, 2024, through July 25, 2024. During her employment, Alonso verbally represented to Plaintiff that the position would last a minimum of one year and that he intended to seek an increase to full-time hours through the Board of Directors — representations upon which Plaintiff reasonably relied to her economic detriment.

78.     EOPR terminated Plaintiff's employment without just cause as defined under Law 80. The proffered justifications are entirely pretextual: (a) no actual reduction in EOPR's budget has been demonstrated, and Plaintiff was the only employee terminated; (b) no negative performance evaluations, disciplinary records, written warnings, or performance improvement plans exist in Plaintiff's employment record; (c) the "professional fit" rationale is wholly unsupported by any documentation and was communicated without prior process or warning of any kind; and (d) the termination occurred one week after the organization's most successful public policy event, which was driven entirely by Plaintiff's independently produced work product.

79.     As a result of her unjust dismissal, Plaintiff is entitled to severance pay (mesada) as computed under Law 80 based on her salary and length of service, the exact amount to be determined at trial upon receipt of complete payroll records.

## COUNT VI — WORKPLACE HARASSMENT

*P.R. Law No. 90 of August 7, 2020, 29 L.P.R.A. §§ 3111–3124*

80.     Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

81.     Defendant Alonso engaged in a sustained, systematic, and repeated pattern of hostile, intimidating, humiliating, and abusive conduct toward Plaintiff throughout her employment, including but not limited to:

   (a) Aggressive calls outside business hours, including at 10:02 p.m. on a Saturday night (May 11, 2024), and demands for a Zoom meeting from 9:00 to 10:00 p.m. on a weeknight (May 13, 2024);

(b) Deliberate sabotage of Plaintiff's work assignments, including withholding for weeks the Canva platform access link necessary to complete an assigned deliverable, then demanding completion within two days;

(c) Last-minute cancellations, forgotten appointments — including completely forgetting a meeting scheduled just the day before on May 21, 2024 — and manufactured scheduling chaos that systematically disrupted Plaintiff's ability to perform her work;

(d) Public humiliation and demeaning commentary, including the statement that Plaintiff had been hired despite the existence of more qualified candidates, and consistently dismissive and condescending treatment during team meetings and one-on-one interactions;

(e) Requiring Plaintiff to work more than forty (40) hours in a single week while compensating her for only twenty (20) hours, with full and deliberate knowledge of the uncompensated hours;

(f) Appropriation of Plaintiff's work product at the July 16, 2024 press conference and deliberate interference with Plaintiff's ability to receive professional recognition for her contributions;

(g) Repeatedly failing to honor promises of resources, expert meetings, educational access, and professional support that had been offered as inducements to Plaintiff's acceptance of the position;

(h) Systematic unreliability in payroll administration, requiring Plaintiff and her colleagues to repeatedly pursue Alonso simply to receive their earned compensation; and

(i) Creation of a pervasive climate of fear and professional insecurity in which Plaintiff reasonably feared that asserting her rights or complaining about working conditions would result in termination.

82.    This pattern of conduct was sustained and pervasive throughout Plaintiff's employment, severely and measurably affected her dignity, emotional and physical wellbeing, professional performance, and economic security, and constitutes workplace harassment as defined under Law 90. The pattern of substantially similar conduct directed at other female employees — Karla, Alexandra, and Linda — further confirms the systematic, intentional, and gender-based nature of the harassment.

83.     As a direct and proximate result of this workplace harassment, Plaintiff is entitled to compensatory damages, including damages for severe emotional distress, economic harm, and the diminishment of her professional opportunities and career advancement.

## COUNT VII — DAMAGES

*Against All Defendants — Puerto Rico Civil Code of 2020*

84.     Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

85.     By reason of the willful, malicious, and grossly negligent conduct of Defendants, acting individually and in concert, Plaintiff has sustained the following damages, all of which are recoverable under the Puerto Rico Civil Code of 2020 and the applicable statutes cited herein:

(a) Severe and ongoing emotional distress, mental anguish, anxiety, and psychological harm resulting from the sustained sexual harassment, hostile work environment, gender discrimination, and retaliation to which she was subjected throughout her employment;

(b) Significant economic damages, including lost wages and employment benefits from the date of her unlawful termination, loss of future earning capacity, and damage to her professional trajectory and long-term career advancement opportunities;

(c) Damage to her professional reputation in the public policy community in Puerto Rico and in her broader professional networks, caused by Alonso's appropriation of her work product, his public characterization of her as "inexperienced," and the circumstances of her unlawful termination;

(d) Loss of the professional contacts, advocacy relationships, and career opportunities that she was positioned to develop through the EOPR press conference and her advocacy work, which Alonso deliberately and systematically blocked; and

(e) All other actual, consequential, and punitive damages permitted under the Puerto Rico Civil Code of 2020 and all applicable statutes.

## V.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Christina Mójica Borjas respectfully prays that this Honorable Court enter judgment in her favor and against all Defendants, jointly and severally, and grant the following relief:

(a) A declaration that Defendants' conduct violated P.R. Law No. 17 of 1988, P.R. Law No. 100 of 1959, P.R. Law No. 115 of 1991, P.R. Law No. 80 of 1976, P.R. Law No. 90 of 2020, and the Puerto Rico Civil Code of 2020;

(b) Front pay and lost wages (back pay) compensation covering the full economic harm resulting from Plaintiff's unlawful termination, including the loss of salary, benefits, and professional opportunities from the date of termination through the date of judgment, in amounts to be proven at trial, for an amount not less than $300,000;

(c) Compensatory damages for sexual harassment (quid pro quo and hostile work environment), gender discrimination, workplace harassment, retaliation, and severe emotional distress and mental anguish, in amounts to be proven at trial, for an amount not less than $300,000;

(d) Double indemnification for gender discrimination pursuant to P.R. Laws No. 100 of 1959;

(e) Double compensation for retaliation pursuant to P.R. Law Nos. 115 of 1991 and Law No. 17 of 1988, for an amount not less than $300,000;

(f) Severance pay (mesada) for unjust dismissal pursuant to P.R. Law No. 80 of 1976, calculated based on Plaintiff's salary and length of service, in an amount to be determined at trial;

(g) Punitive damages for the willful, malicious, and deliberate discriminatory and retaliatory conduct of Defendants;

(h) Pre-judgment and post-judgment interest at the maximum rate permitted by law;

(i) Reasonable attorney's fees and all litigation costs pursuant to all applicable statutes; and

(j) Such other and further relief as this Honorable Court deems just, proper, and equitable under the circumstances.

**JURY TRIAL DEMANDED**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

**RESPECTFULLY SUBMITTED**

In San Juan, Puerto Rico, this 2nd day of June, 2026.

**DESPACHO LEGAL DORNA-LLOMPART**

s/ José G. Fagot Díaz
**JOSÉ G. FAGOT DÍAZ**
USDC-PR No. 204112
Attorney for Plaintiff Christina Mójica Borjas
1353 Luis Vigoreaux Ave. PMB 805
Guaynabo, Puerto Rico 00966
Tel.: (787) 367-8702 / (787) 413-0672
mdorna@icloud.com / jgf@fagot-law._com
josegabrielemilio@gmail.com
